**EXHIBIT D**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

RECEIVED
U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

2005 AUG -4  PM 6: 36

NANCY M.
MAYER-WHITTINGTON
CLERK

JOHN FLYNN, JAMES BOLAND, GERALD )
O'MALLEY, KEN LAMBERT, GERARD SCARANO, )
H. J. BRAMLETT, EUGENE GEORGE, PAUL )
SONGER, CHARLES VELARDO, MATTHEW )
AQUILINE, GREGORY R. HESS, MICHAEL )
SCHMERBECK, VINCENT DELAZZERO, and BEN )
CAPP, JR., as Trustees of, and on behalf of, the )
BRICKLAYERS & TROWEL TRADES )
INTERNATIONAL PENSION FUND, )
  1776 Eye Street, NW, Fifth Floor )
  Washington, DC  20006 )
  (202) 783-3788, )

INTERNATIONAL MASONRY INSTITUTE )
  1776 Eye Street, NW, Fifth Floor )
  Washington, DC  20006 )
  (202) 783-3788, )

    and )

INTERNATIONAL UNION OF BRICKLAYERS AND )
ALLIED CRAFTWORKERS )
  1776 Eye Street, NW, Fifth Floor )
  Washington, DC  20006 )
  (202) 783-3788, )

          Plaintiffs, )

          v. )

ACME TILE, INC. )
  d/b/a ACME TILE CO., INC., )
  12417 – 5th Street )
  Pekin, IL  61554 )
  (309) 348-1543 )

          Defendant. )

Civil Action No. 1:05CV01052
Judge:  John D. Bates
Deck Type:  Labor/ERISA
      (Non-employment)
Date Stamp: 5/25/05

## AMENDED COMPLAINT

    Plaintiffs, by their attorneys, DICKSTEIN SHAPIRO MORIN & OSHINSKY

LLP, complaining of the Defendant, allege as follows:

## CAUSE OF ACTION

### Jurisdiction and Venue

1.    This is an action brought by the fiduciaries of the Bricklayers & Trowel Trades International Pension Fund ("IPF"), and the fiduciaries of the International Masonry Institute ("IMI"), to enforce the terms of the Plan and Trust Agreements adopted by the IPF and IMI and the provisions of Section 515 of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1145. This action arises under the laws of the United States, specifically Section 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3). Pursuant to Section 502(e)(1) of ERISA, 29 U.S.C. § 1132(e)(1), jurisdiction is therefore conferred on this Court. As to the claims brought by the International Union of Bricklayers and Allied Craftworkers ("BAC"), jurisdiction is conferred under § 301 of the Labor-Management Relations Act, 29 U.S.C. § 185.

2.    The IPF and IMI are administered in the District of Columbia. Venue for the claims asserted by the IPF and IMI is conferred on this Court pursuant to Section 502(e)(2) of ERISA, 29 U.S.C. § 1132(e)(2), which provides:

> (2) Where an action under this subchapter is brought in a district court of the United States, it may be brought in the district where the plan is administered, where the breach took place, or where a defendant resides or may be found, and process may be served in any other district where a defendant resides or may be found.

3.    BAC maintains its principle office in the District of Columbia. Venue for the claims asserted by the BAC is therefore conferred on this Court pursuant to 29 U.S.C. § 185(c)(1).

### Parties

4.    Plaintiffs, John Flynn, James Boland, Gerald O'Malley, Ken Lambert, Gerard Scarano, H. J. Bramlett, Eugene George, Paul Songer, Charles Velardo, Matthew

DSMDB.1943981.1

Aquiline, Gregory R. Hess, Michael Schmerbeck, Vincent DeLazzero and Ben Capp, Jr., are Trustees of, and sue on behalf of, the IPF. The IPF is an "employee benefit plan" within the meaning of Section 3(3) of ERISA, 29 U.S.C. § 1002(3), and is a "multiemployer plan" within the meaning of Section 3(37) of ERISA, 29 U.S.C. § 1002(37). Plaintiffs bring this action on behalf of, and for the benefit of, the beneficiaries of the IPF in their respective capacities as fiduciaries.

5.      The IPF is also authorized to effect collections on behalf of the IMI and BAC, pursuant to a written Assignment of Claims and the *Collection Procedures of the Central Collection Unit of the Bricklayers and Allied Craftworkers* ("Collection Procedures").

6.      Plaintiff, IMI, is an "employee benefit plan" within the meaning of Section 3(3) of ERISA, 29 U.S.C. § 1002(3), and is a "multiemployer plan" within the meaning of Section 3(37) of ERISA, 29 U.S.C. § 1002(37).

7.      Plaintiff, BAC, an unincorporated association, is a labor organization within the meaning of 29 U.S.C. § 152(5) and is entitled to bring suit under 29 U.S.C. § 185.

8.      Defendant, Acme Tile, Inc., d/b/a Acme Tile Co., Inc., is, and at all times hereinafter mentioned was, a company maintaining offices and conducting business in the state of Illinois.

9.      Defendant employs or has employed members of the International Union of Bricklayers and Allied Craftsmen and its affiliated local unions ("Union").

## Violation Charged

10.     Acme Tile, Inc., d/b/a Acme Tile Co., Inc., acting through its authorized agent or officer, executed collective bargaining agreements with the Union. These

collective bargaining agreements are annexed hereto as Exhibits A and B and are hereinafter referred to as the "Agreements".

11.     Acme Tile, Inc., upon information and belief is doing business as Acme Tile Co., Inc. (hereinafter referred to collectively as "Defendant").

12.     Pursuant to the Agreements, Defendant agreed to make certain payments to the IPF, IMI, and BAC on behalf of covered employees of Defendant.

13.     Having submitted some contributions, Defendant has demonstrated an awareness of the obligation to make those payments.

14.     However, an examination of the books and records ("audit") of Defendant revealed that Defendant has not reported correctly and has failed to make required contributions for employees covered by the Agreements.

15.     As determined by the audit, delinquent contributions payable to the IPF and IMI from Defendant for the time period January 1, 2001 through December 31, 2003 amount to $4,526.81.

16.     Under the terms of the Plan and Trust Agreements adopted by the IPF, and IMI, interest, as determined by the audit, in the amount of $2,432.57 calculated

from the Date Due through March 8, 2005, and an additional computation of interest in the amount of $2,071.25, as provided for by ERISA, have been assessed on the delinquent contributions payable to the IPF and IMI for work performed by Defendant's employees during the time period January 1, 2001 through December 31, 2003.

4

17.    Defendant also owes the BAC delinquent dues checkoff moneys in the amount of $795.58, as determined by the audit, and interest in the amount of $361.32, for work performed by Defendant's employees during the time period January 1, 2001 through December 31, 2003.

18.    To date the delinquent contributions, interest and additional computation of interest believed due and owing have not been paid.

19.    Plaintiffs have brought this action in faithful performance of the fiduciary duties imposed upon them under Section 404(a)(1) of ERISA, 29 U.S.C. § 1104(a)(1).    Plaintiffs have been, and are, incurring additional attorney's fees as a direct result of Defendant's failure to make contributions in accordance with the terms and conditions of the Agreement.

WHEREFORE, Plaintiffs pray for judgment against Defendant as follows:

1.    For the total amount of $12,412.53, which is constituted as follows:

a.    For unpaid contributions in the amount of $4,526.81 due payable to the IPF and IMI for the time period January 1, 2001 through December 31, 2003 (ERISA Section 502(g)(2)(A));

b.    For interest in the amount of $2,071.25 assessed on such delinquent contributions, calculated at 15 per cent per annum from the Date Due (ERISA Section 502(g)(2)(B));

c.    For an additional computation of interest in the amount of $2,071.25 assessed on delinquent contributions owed to the IPF and IMI, calculated at 15 per cent per annum from the Date Due (ERISA Section 502(g)(2)(C)(i));

d.    For dues checkoff moneys owed to the BAC in the amount of $795.58 (29 U.S.C. § 185);

e. For interest in the amount of $361.32 on such delinquent dues checkoff moneys;

f. For audit costs in the amount of $1,975.00 (ERISA Section 502(g)(2)(D));

g. For the costs of filing this action in the amount of $250.00 (ERISA Section 502(g)(2)(D)).

2. In the amount of Five Thousand Dollars ($5,000.00), and such additional amounts as may be incurred, representing attorney's fees and costs of this action (ERISA Section 502(g)(2)(D)).

3. That Defendant be directed to comply with its obligations to correctly report and to contribute to the IPF, IMI, and BAC all additional reports and contributions due and owing, and to pay the costs and disbursements of this action.

4. Such other relief as this Court deems appropriate, including judgment for any contributions and/or interest thereon that may accrue subsequent to the filing of this complaint, as well as any resulting statutory damages thereon under ERISA.

Dated: August _4_, 2005          By: _____

                                 Ira R. Mitzner, DC Bar No. 184564
                                 DICKSTEIN SHAPIRO MORIN
                                   & OSHINSKY LLP
                                 2101 L Street, NW
                                 Washington, DC  20037-1526
                                 (202) 828-2234

                                 Attorneys for Plaintiffs

DSMDB.1943981.1

EXHIBIT  A

*371L*
*IL9346*

**AGREEMENT**        Final Draft

THIS AGREEMENT made and entered into this __6__ day of __May__, 1993, by and between Bricklayers, Masons, Plasterers, Tile Setters and Cement Finishers Local Union No. 37 as chartered by the International Union of Bricklayers and Allied Craftsmen (hereinafter the "Union") and the Kankakee Area Contractor's Association, Inc., an Illinois corporation (hereinafter the "Employers").

**W I T N E S E T H :**

WHEREAS, the Employers and the Union each respectively have economic interests and commitments to promotion of quality tradesmen within the geographic area in which they perform services; and

WHEREAS, the Masonry Industry, in particular, and the Construction Industry, in general, will benefit by close cooperation of the parties hereto and the provisions hereinafter set forth will promote a system under which the Employers, the Union and its membership will benefit by definition of the respective right and obligations of the parties hereto and the methods by which grievances, differences and claims between them, if any, may be adjusted and determined.

NOW THEREFORE, in consideration of the mutual promises, agreements, representations, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree and bind themselves as follows:

**RECITALS**

The foregoing recitals are hereby incorporated in the body of this Agreement as if set forth herein verbatim.

**TERM**

This Agreement shall exclusively control the operation of Masonry and related crafts and skills as more particularly set

1

forth below from the date of execution hereof and it shall remain in full force and effect until May 31, 1995.   Should services be provided to the Employers after such date by the Union without benefit of a written agreement then the terms of this Agreement shall control the rights and obligations of the parties to each other so long as such services are provided by the Union or its membership.

### GEOGRAPHIC SCOPE

This Agreement shall exclusively control the operation of Masonry and related crafts and skills in the Counties of Kankakee and Iroquois, State of Illinois.

### RECOGNITION

The Employers recognize the Union as the sole and exclusive representative within the geographic scope of this Agreement for all Bricklayers, their allied craftsmen and their apprentices for the purposes of collective bargaining with respect to :   rates of pay, wages, hours of employment, working conditions, welfare of its membership and pensions.

### UNION SECURITY

It shall be a condition of employment that all Bricklayers and Allied Craftsmen of the Employers shall be Members of the Union in good standing or otherwise be authorized by the Union to provide services to the Employer.   All new Employers covered by this Agreement shall be required to become and remain Members of the Union as a condition of employment from and after the seventh (7th) day following such employee's date of hire. Should any employee covered hereunder fail to comply with the provisions of this paragraph because of nonpayment of dues, nonpayment of initiation fees, noncompliance with the Union's By-Laws, Rules and/or Regulations, then, in such event the Employers must discharge said employee according to the National Labor Relations Act, as amended, within twenty-four (24) hours of notice to an Employer by the Union of any such failure.

2

## DESIGNATION OF COVERED WORK

The Employers shall exclusively use Union members for performance of the following:

Cement Masonry Work - For the purpose of this Agreement, Cement Masonry Work shall be defined as:

Foremanship over all concrete construction, all concrete and composition work of whatever nature, such as buildings, bridges, silos, elevators, smoke stacks, curbs and gutters, sidewalks, streets and roads, paving, alleys and roofs, mass or reinforced concrete slabs and all flat surfaces or cement, the rodding and finishing of same, whether done by float, trowel, machine or any other process. The rodding and tamping of all concrete and the spreading and finishing of all top materials, sills, coping, steps, stairs, risers and running all cement and plastic material with a six (6) inch base or less, finishing or washing of all concrete construction, using any color pigment when mixed with cement whether done by brush, broom, trowel, float or any other process, operation of machines for scoring floors or any purpose that they may be used for in connection with the Cement Mason trade, stricking off, floating and finishing of all walls, piers and foundations, the setting of all screeds, stakes and forms on floor and sidewalks, whether wood or steel forms are used, the setting of all curb and gutter forms whether wood or steel forms are used, the setting of all forms for paved ditch and slope walls, the setting of all wood forms for hard roads, streets and alleys, the setting of all wood forms inside the property line for paving such as parking lots, driveways and storage lots, the setting of all expansion joints in floors, sidewalks, driveways, or any other flat surface of concrete, cutting of all construction and contracting joints on hard roads, streets, alleys, floors, sidewalks or any other flat surface of concrete with a skill saw or any other machine used for that purpose, all preparation work on concrete construction to be finished or rubbed, such as cutting of nails, wires, wall ties, etc., the patching, brushing, chipping and bush-hammering, rubbing or grinding if done by machine or carborundum stone of all concrete construction, the pointing, patching and

3

caulking around all steel or metal window frames that touch concrete, laying and finishing of gypsum material roof, dry packing, grouting and finishing in connection with setting all machinery such as engines, pumps, generators, air compressors, tanks, etc., that is set in concrete foundations, all finishing in connection with prefabricated and prestressed construction on job sites including supervision of same such as sidewalks, stoops, floor slab beams, joist, walls, columns, screeding, finishing, rubbing, grouting, caulking and patching of same, applying of hardener on finished concrete floors whenever necessary, whether by chemical compound or otherwise, regardless of tools used. The spreading, screeding darbying and trowel finishing of all types of magnesium oxychloride cement composition floors, including all types of oxychoride, granolithis or terrazzo composition floors, hand grinding or machine grinding; the preparation of all sub-floor surfaces, bonding, preparation and installation of ground or base courses, steps and cove base. The waterproofing of all work such as thoroseal, ironite, plasterweld and any similar product regardless of the tools used or the method of application or color of material used and regardless of the type of base these materials may be applied to. Cement Masons shall operate all vibrating screeds or strike off that which is motor driven or air driven for the purpose of bringing concrete slab to grade and ready for finishing. Cement Masons shall operate floating machines and troweling machines that are being used on any floor, sidewalk or any other surface where covered material is being placed and finished.

Bricklaying Masonry Work - For the purpose of this Agreement Bricklaying Masonry Work shall be defined as:

Bricklaying Masonry shall consist of the laying of bricks made from any material in, under or upon any structure or form of work where bricks are used, whether in the ground, or over its surface, or beneath water; in commercial building, rolling mills, iron works, blast or smelter furnaces, lime or brick kilns; in mines or fortifications, and in all underground work, such as sewers, telegraph, electric and telephone conduits. All fireproofing,

4

blockarching, terra cotta cutting and setting, the laying of all tile, mineral-wool, cork blocks and glass masonry, or any substitute for above material, the filling of all joints on the same when such sewers or conduits are of any vitreous material, burnt clay or cement, or any substitute material used for the above purpose, the setting, pointing and striking joints of cut stone and artificial stone, and setting, cutting and trimming either with hand or power tools of fire brick terra cotta and hollow tile and the pointing up of all brick, stone or terra cotta on new and old buildings.  All brick paving and installations of all brick work and other refractory materials with reference to the installation of boilers and furnaces and their brick work or refractory material repairs and replacements and all other construction where firebrick or other refractory materials are used, including all boiler baffles, made of tile or refractory materials shall be the work of Bricklayers.  All plastic or poured refractory materials whenever used, including boiler baffles, shall be under the supervisor of a Bricklayer.  The installation of nail on brick work and of all panels fabricated with such chemical compounds, as thiokols, epoxy resins, plyesters, etc. adaptable for use in the masonry industry.

Stone Masonry Work - For the purpose of this Agreement Stone Masonry Work shall be defined as:

The laying of all rip rap, rubble work or flagstone, with or without mortar, setting all cut stone, marble, slate or stone work (meaning as to stone, any work manufactured from such foreign or domestic products as are specified and used in the interior or on the exterior of building by architects, and customarily called "stone" in the trade).

Concrete Block Work - For the purpose of this Agreement Concrete Block Work shall be defined as:

The cutting, laying, pointing, caulking, cleaning, of all concrete block units, or similar units or substitutes, regardless of the size, and the handling and application of the loose aggregate, and shall include all sewer work eight inches or over, composed of cement, clay or substitute material.  It shall include fabrication at the plant and setting on the job of all masonry

5

components. Additionally, the installation of all insulation which is pumped, poured or placed into a masonry block core or cavity created between a masonry exterior wall and an interior wall or a masonry interior wall of any type.

Marble, Mosaic and Terrazzo Work - For the purpose of this Agreement Marble, Mosaic and Terrazzo Work shall be defined as:

All work concerning installation of marble mosaic, venetian enamel and terrazzo, including the cutting and assembly of art ceramic, glass mosaic, the casting of all terrazzo in shops and mills and all scratch coat on walls and ceilings where mosaic and terrazzo is to be applied and all bedding above concrete floors or walls, that the preparation, laying or setting of the metal or wooden strips and grounds, where mosaic and terrazzo is to be applied.

Tile Layer's Work - For the purpose of this Agreement Tile Layer's Work shall be defined as:

The laying or setting of all tile where used for floors, walls, ceilings, walks, promenade roofs, stair treads, stair risers, facings, hearths, fireplaces, and decorative inserts, together with any marble plinths, thresholds or window stools used in connection with any tile work; also to prepare and set all concrete, cement, brickwork, or other foundation or materials that may be required to properly set and complete such work; the setting or bedding of all tiling, stone, marble, composition, glass, mosaic, or other materials forming the facing, hearth or fireplace of a mantle, or the mantle complete, together with the setting of all cement, brickwork, or other material required in connection with the above work; also the slabbing and fabrication of tile mantels, counters and tile panels of every description and the erection and installation of same and the building, shaping, forming, construction, or repairing of all fireplace work, whether in connection with a mantle hearth facing or not, and the setting and preparing of all material, such as cement, plaster, mortar, brickwork, iron work or other materials necessary for the proper and safe construction and completion of such work.

6

Plastering Work - For the purpose of this Agreement Plastering Work shall be defined as:

All exterior or interior plastering, plain or ornamental, when done with stucco, cement and lime mortars or other materials, artificial marble work, when applied in plastic form, composition work in all its branches, the covering of all walls, ceilings, soffits, piers, columns or any part of a construction of any sort when covered with any plastic material in the usual methods of plastering, is the work of the Plasterer. The casting and sticking of all ornaments of plaster or plastic compositions, the cutting and filling of cracks. All cornices, molding, coves, and bullnoses shall be run in place on rods and white mortar screeds and with a regular mold, and all substitutes of any kind, when applied in plastic form with trowel, or substitute for same, is the work of the Plasterer.

Pointing, Caulking and Cleaning Work - For the purpose of this Agreement Pointing, Caulking and Cleaning Work shall be defined as:

Pointing, caulking and cleaning consists of the pointing, caulking and cleaning of all types of masonry, caulking of all types of masonry, caulking of all window frames incased in masonry on brick, stone or cement structures, including all grinding and cutting out on such work and all sand blasting, steam cleaning and gunite work and the pointing, cleaning and weatherproofing of all buildings, grain elevators and chimneys built of stone, brick or concrete and all grinding and cutting out, sand blasting and gunite work on same.

Shoddies, Broken and Random Ashlar Work - For the purpose of this Agreement Shoddies, Broken and Random Ashlar Work shall be defined as:

Cutting all shoddies, broken ashlar or random ashlar that is roughly dressed upon the beds and joints, and range ashlar not over ten (10) inches in height; the dressing of all jambs, corners and ringstones that are roughly dressed upon the beds, joints or reveals, and the cutting of a draft upon same for plumbing purposes only; and the cleaning and pointing of stone work. This definition is to all work on buildings, sewers, bridges, railroad or other

public works, and to all kinds of stone.

### JURISDICTIONAL DISPUTES

The Employers, or any entity hiring Union members, and the Union shall, in good faith, meet upon twenty-four (24) hours written notice by either party and attempt to settle any dispute of whether a particular type of work was contemplated to be done by the Union in accordance with this Agreement or was contemplated to be done by another craft or trade.  Should the Employer(s) not be able to agree with the Union as to whether the disputed work is to be covered work hereunder or not the parties agree to binding arbitration by an impartial party according to the Illinois Arbitration Act, as amended.  For the purpose of this paragraph, notice by facsimile transmission shall constitute written notice.

### REFERRAL SYSTEM

The parties hereto acknowledge that the job referral system as hereinafter provided is in the best interest of maintaining an efficient system of production, promotion of quality craftsmanship, providing an orderly procedure to facilitate employment to the Employers on an as needed basis and to eliminate discriminatory hiring practices.

No employer hereunder shall employ any employee not referred to such employer by the union, unless such employment is specifically provided for hereinbelow.

Employers shall give twenty-four (24) hours advance notice to the Union whenever they require hiring of personnel to perform covered work.  All such notice shall set-forth:

1.    the job location;

2.    duration, extent and classification of the covered work;

3.    the number of journeymen requested from the Union; and

4.    the date and time such journeymen are to report to work.

All personnel referred to Employers by the Union shall be referred in accordance with the following:

Group I Applicant - Personnel having three (3) years experience in performance of covered work within the

8

geographic scope of this Agrement and having performed one hundred (100) hours of covered work within the six (6) months immediately preceding any contemplated referral shall be designated a Group I Applicant.

Group II Applicant - Personnel having three (3) years experience in performance of covered work outside the geographic scope of this Agreement shall be designated a Group II Applicant.

Group III Applicant - Personnel having less than three (3) years experience in performance of covered work but more than six (6) months experience in performance of covered work within the geographic scope of this Agreement shall be designated a Group III Applicant.

Group IV Applicant - Personnel having experience in performance of covered work which have never worked within the geographic scope of this Agreement shall be designated a Group IV Applicant.

Employers may at any time request any Group I Applicant for employment from the Union for hiring as a special applicant. Employers may only request a Group II Applicant from the Union as a special applicant if, and only if, fifty percent (50%) of the personnel performing covered work for that particular Employer were Group I Applicants. Employers may only request a Group III Applicant as a special applicant if fifty percent (50%) of the personnel performing covered work for the particular Employer are Group I and Group II Applicants. An Employer may only request a Group IV Applicant as a special applicant if fifty percent (50%) of the personnel performing covered work for that particular Employer are Group I, II and III Applicants.

When an Employer, without requesting a named applicant as set forth above, requests personnel for hiring the Union shall first refer all Group I Applicants. When all Group I Applicants available for work have been employed, then, the Union shall refer all Group II Applicants. When all Group II Applicants have been employed, then, the Union shall refer all group III applicants. When all Group III Applicants have been employed, then, the Union

shall refer all Group IV Applicants.

The Union shall refer all applicants within a group in chronological order of their registration with the Union. The Union shall keep all group registration lists open to applicant and Employer inspection during regular business hours.

The referral system as set forth herein is acknowledged by the parties hereto to be nondiscriminatory and shall be administrated so as not to be affected by Union membership. The Employers retain the right to reject any applicant referred to them by the Union.

Should any dispute arise concerning the rights of the Employer, the Union, employees or applicants for employment under the referral system as provided for herein, such dispute shall be arbitrated in accordance with the Illinois Arbitration Act.

The Union and the Employer shall post the referral system provided for herein where it is visible to applicants for employment or otherwise customarily posted.

## MANAGEMENT RIGHTS OF EMPLOYERS

The Employers retain the right to manage their operations and direct the work force. Employers shall have the right to designate the number of men to be used on any particular job, with the expressed exception of those jobs involving blocks or stone in excess of forty (40) pounds and or hanging scaffolds as set forth in the safety provisions hereinbelow.

The Employers may discharge or lay-off employees doing covered work according to the quality of work performed by said employees. Should the business agent or steward on a job request the reason for a discharge the Employer will submit said reason(s) to the Union in writing not more than three (3) days after such request.

## WAGES, PENSION, HEALTH & WELFARE, CHECK-OFF

The Employer shall pay wages, contribute to the employee pension and health and welfare funds, and pay the Union working assessments and Union dues in accordance with Schedule A as attached hereto and made part hereof.

10

When epoxy is put down there shall be an increase of twenty-five cents (.25¢) per hour above the regular scale of wages.

When grinding concrete for less than four (4) hours, four (4) hours will be paid; if more than four (4) hours, eight (8) hours will be paid at the rate of twenty-five cents (.25¢) per hour above the regular scale of wages.

Any work done on swinging or hanging scaffolds, there shall be two (2) employees as a safety measure. Each to receive fifty cents (.50¢) per hour above regular scale of wages.

Work assigned to trowel trades in sewers, on manholes, catch basins, conduit or tunnel work shall be paid for at the rate of twenty-five cents (.25¢) per hour above the regular scale of wages. If less than four (4) hours, four (4) hours will be paid; if more than four (4) hours, eight (8) hours will be paid.

Any Brick Mason designated to operate the masonry saw for cuts other than his own, shall receive twenty-five cents (.25¢) per hour above the regular scale of wages for hours worked on the saw.

Foreman must supervise all layout work and give all orders to journeymen and apprentices. The foreman on the job shall receive no less than One Dollar ($1.00) per hour extra pay above the regular scale of wages.

Notwithstanding anything herein to the contrary, all covered work performed on single family residential housing units containing not more than 3000 square feet of living area (excluding basement and garage areas) shall be compensated at a rate 25% less than the rate set forth on Exhibit A hereto. The operation of this paragraph shall not affect health and welfare pension or any other benefits covered and/or provided under this agreement.

Each employer, in addition to wages set forth on schedule A hereto, shall pay to the union 1 cent for each hour worked performing covered work hereunder as a contribution to a Construction Industry Advancement Fund. Each month the union shall account for amounts paid and received into said fund and remit such funds to the Kankakee Area Contractor's Association. The union shall have no responsibility to collect funds due under this subparagraph and the Kankakee Area Contractor's Association does

hereby indemnify and hold the union harmless from any and all claims demands lawsuits and arbitrators arising out of the provisions herein contained. The 1 cent per hour contribution provided for herein shall not be construed, interpreted or held to be wages, salaries or other compensation for any purpose whatsoever.

### BONDING REQUIREMENTS

Unless waived by mutual agreement between the Employer and the Union, any Employer who has not maintained a business office within the jurisdiction covered by this Agreement for at least one full year immediately preceding the execution of this Agreement shall obtain and maintain during the term of this Agreement a surety bond in the amount of Five Thousand Dollars ($5,000.00) to guarantee to his employees working under this Agreement the payment of wages and fringe benefits, including Pension Funds and Welfare Funds payment.

In the event of failure, default or refusal of the Employer to meet his obligations to his employees or the Pension Fund and Welfare Funds, when due, the Union aggrieved employees or the Trustees of the Pension Fund and Welfare Funds, after written notice to the Employer and bonding company, may file claim to obtain payment, costs and reasonable attorney fees thereon from the applicable surety bond.

Failure of an Employer to obtain and maintain an effective surety bond as required herein, or failure, and default by an Employer of payment of obligations covered by this Agreement in excess of the amount of the surety bond may, at the option of the Union, be declared by the Union a gross breach of this Agreement in consequence of which the Union shall have the right to resort to economic and other sanctions against said Employer.

In the event the Union agrees to waiver or fails to secure the above bond, the problem becomes one between the Union and the violating contractor and shall cause no work stoppage or liability to any other contractor or the general contractor on the project.

### SAFETY AND HYGIENE

12

When Bricklayers are working on any job or building where other men are working over them, such as carpenters, iron workers, or laborers, there shall be a suitable covering of plank placed over them to protect them from anything falling on them while at work.  All motors on saws to be grounded.

Any straight edge or strike off over eight (8) feet in length, shall require two (2) cement finishers if the slump of concrete is three (3) inches or less.

Contractors must have at least two (2) Cement Finishers on any and all jobs after dark.

There must be a toilet on each job or leave given for such purposes. A suitable employee change house and lunch room must be provided and heated when needed.

Members of the trowel trades shall be given time to clean their tools at the end of a day's work and have them in the change house by quitting time.  A minimum of five (5) minutes shall be allowed.

In no case shall a scaffold be dismantled to a point where it may cause injury to workers.  Working height of scaffolds shall be a maximum of fifty-six (56) inches.  Hopboard shall be a maximum of twenty-four (24) inches to top out only.  Top out shall not exceed fifty-six (56) inches above hopboard; forty-eight (48) inches above hopboard if wall is struck on the backside.  The base scaffolding will be five (5) planks wide when hopboards are used.

No six (6) foot panels or higher will be allowed to be used for masonry scaffolding unless adjusted to a proper working height.  Working height shall be determined by the business agent and steward on the job.

Two (2) men shall be used to lay blocks weighing forty (40) pounds or over.

In no case shall men be laid off for the stocking of scaffolds and there shall be no time off between starting and quitting time for the building and stocking of scaffolds.

Contractors shall furnish dust collectors or masks, ear plugs and safety glasses to operators of a dry saw, and rubber aprons, ear plugs and rubber gloves to operators of a wet saw.

All ladders for scaffolds shall be of OSHA Requirements, thirty-six (36) inches above the top of scaffolds and tied off.

When a self-propelled curb machine is used on specific jobs, it shall be at the discretion of the foreman whether two (2) or three (3) finishers shall be required.

Work done on swinging or hanging scaffolds, shall require a minimum of two (2) employees as a safety measure.

Any employee refusing to comply to the safety standards as established in the "Occupation Safety and Health act of 1970 and/or the Safety and Health Regulations for Construction Act of 1968," effective April 28, 1971, after one warning by the foreman and/or superintendent through the steward, shall be dismissed immediately without question.

### HOURS OF LABOR

All laws and resolutions which tend to shorten the hours of labor when constitutionally expressed and approved by the International Union shall be strictly enforced by this Union.

Eight (8) hours shall constitute a day's work. Work shall begin at 7:00 a.m. and end at 3:30 p.m. Work breaks shall be as follows:

1). 9:30 a.m. - a ten (10) minute work break; and

2). 2:00 p.m. - a ten (10) minute work break; and

3). On any shift work or overtime, work breaks shall be scheduled by the Job Foreman and the Business Agent, but in no event shall the work breaks be held less frequently than once in each four (4) hour period.

Said period to be used by the employee as a coffee break and to be paid by the employer. A one half (1/2) hour lunch break shall be provided employees after the first 4 hours of the work day. The noon hour may be curtailed by a special agreement between the Employer and employee by the majority of the masons working on the job, but not in any way as to permit more than eight (8) hours between the hours mentioned. In the event employees work under a specifically agreed curtailed lunch period, and said lunch period is not provided during that 8 hour work day, then said employees so working shall be paid one and one half (1 1/2) times their rate

14

of pay for such 1/2 hour lunch period.  Should work continue for an excess of 10 hours, a second paid one half (1/2) hour meal break shall be provided.

Night work and work done after 3:30 p.m. will be considered overtime and must be charged at the rate of time and a half (1½).  All work done on Sunday, Fourth of July, Thanksgiving, Christmas, New Year's Day, Labor Day, and Armistice Day, or days celebrated as such, must be charged at double time.

Members of Local #37 will receive time and a half (1½) for all overtime including Saturday work.  Double time will be paid for all Members of Local #37 for Sunday and Holidays.

Work done between 3:30 p.m. and 7:00 a.m. and Saturday shall be paid at the rate of time and a half (1½).  Sunday, Memorial Day, Fourth of July, Thanksgiving, Christmas, Labor Day and New Year's Day or days celebrated as such shall be paid at the rate of double time.  Veteran's Day will be celebrated day after Thanksgiving. No work shall be done on Labor Day.

When what is known as three (3) shift work is carried on, the first shift shall work seven and one-half (7½) hours between the hours of 7:00 a.m. and 3:00 p.m. and be paid for eight (8) hours at the regular rate of wages.  The second shift shall work seven and one-half (7½) hours between the hours of 3:00 p.m. and 11:00, and be paid for eight (8) hours at the regular rate of wages.  The third shift shall work seven (7) hours between the hours of 11:00 and 6:30 a.m. and be paid for eight (8) hours at the regular rate of wages.  No overtime on Saturday morning shift (11:00 to 6:30 a.m. Saturday).

If what is commonly known as two (2) shift work is performed and the contractor desires to start the shift at 7:00 a.m., said shift will work seven and one-half (7½) hours between the hours of 7:00 a.m. and 3:00 p.m. and be paid for eight (8) hours at the regular rate of wages.  The second shift of two shift work shall be performed seven and one-half (7½) hours between the hours of 3:00 p.m. and 11:00 and the employees shall be paid for eight (8) hours at the regular rate of wages.

If the contractor desires to start the first shift before 7:00 a.m., the first shift shall work seven (7) hours and be paid for eight (8) hours at the regular scale per hour; the second shift shall work seven (7) hours immediately following the first shift, and be paid for eight (8) hours at the regular rate of wages.

Any shift work carried on, on Saturdays, Sundays or Holidays shall be paid for at double time.

In no case can the hours of one shift overlap into the hours of the following shift.

No Bricklayer shall work more than one shift in twenty-four (24) consecutive hours.  The aforestated provisions regarding shift work applies exclusively to bricklayers.

### PROHIBITION OF CEMENT FINISHERS - SHIFT WORK

No shift work shall be permitted for cement finishers, unless approved by the Union in writing.

Upon mutual agreement between the Employer and the Union, a flexible working time may be advanced to 7:00 a.m. to 3:30 p.m.

Flexible starting time will be allowed subject to mutual agreement with the business agent.

Residential and Home Construction - Agreement will also be adopted by parties to this Agreement.

If an employee reports for work at the regular time and is not permitted to work, he shall be paid for two (2) hours show up time. If any employee reports for work at the regular starting time and work is started but ceased, due to bad weather, employee must remain on job site for two (2) hours to receive show up time pay, unless released by foreman or superintendent.  When an employer requests additional workmen, and when such workmen report for work at a specified time and place, they shall be paid two (2) hours' show up time in the event they are not permitted to work, weather permitting.

If an employee starts to work, or remains on the job longer than two (2) hours, he shall receive no less than four (4) hours' pay.  If an employee works more than four z(4) hours, the employee shall receive pay for the actual time worked.

16

## GRIEVANCES

Any member discharged from his job for any reason other then/but not limited to unsafe and/or unsatisfactory work or in the event of a shut-down and/or general layoff, may have this brought to the attention of the Grievance Committee.

No employee grievance will be considered unless submitted in writing to Local No. 37 and the Employer within ten (10) days of the alleged violation.  Employer must answer, in writing, within ten (10) days of receiving such notices.  Should the Employer not answer the Notice of Grievance within the ten (10) day period provided for above, then, in such event the Union shall, at their option, proceed with arbitration as provided for in the Illinois Arbitration Act and the parties hereto agree to such arbitration as the sole forum available to them.

The Grievance Committee will consist of the steward, business representative, and two members of the Contractor's Association. In the event the aforementioned should reach a deadlock situation, they shall mutually appoint an arbitrator in accordance with the Illinois Arbitration Act, whose decision will be final and binding. (Any expense involved in the process of arbitration will be borne equally by the contractor and the Union.)

## STEWARDS

A Steward for each job shall be appointed by the Business Representative of the Union and shall represent the Union.  The Steward shall be the last journeyman to be laid off in a cut back and may be discharged only with the approval of the business agent. Approval as required herein shall not be unreasonably withheld.

Stewards not to allow anyone to give orders except the recognized foreman on the job.

## FOREMEN

Each and every job requires a foreman when two (2) or more men are employed.

Any workman or foreman using tools in any of the trowel trades must have a paid up Bricklayers and Allied Craftsmen International

17

Union card or a recognized permit.

Foreman must supervise all layout work and give all orders to journeymen and apprentices. The foreman on the job shall receive no less than One Dollar ($1.00) per hour extra pay above the regular scale of wages.

When there are seven (7) or more members of one craft employed on a project, the foreman shall not work with the tools. Contractors holding a card in the Bricklayers and Allied Craftsmen International Union may run their own work in the trade for which they are qualified.

**APPRENTICES**

Apprentices shall be under the jurisdiction of the Apprentice Committee of Local No. 37. All applications for apprentices by contractors must be referred to the Apprentice Committee and they shall decide as to the ability of the contractor to teach the applicant the trade.

The contractor or his representative and the applicant shall appear in person before the Apprentice Committee to make application.

The wage scale for apprentices shall be as follows:

First six months..................50% of Journeyman wages

Second six months..................60% of Journeyman wages

Third six months..................70% of Journeyman wages

Fourth six months..................80% of Journeyman wages

Fifth six months..................90% of Journeyman wages

Sixth six months..................95% of Journeyman wages

If due to a lack of work the contractor will notify the Union, who will place the apprentice with other contractors until such time as the indenturer has work.

When a start and/or call back situation occurs, the apprentice, if any, will be the third (3rd) man assigned and/or called back. In the event the indenturer has more than one (1) apprentice, the apprentice with the most seniority in the Union will be called back first. In further employment, the ninth (9th) man called back will be an apprentice and so on with every fifth

(5th) man employed thereafter when possible.

Apprentices shall not be permitted to operate an electric saw unless the cuts are for his own use.

## MISCELLANEOUS PROVISIONS

1.    PAYDAY.    All Members of Local No. 37 shall be paid weekly.    Pay to be in the hands of members before 3:30 p.m. on payday.    Any member not paid by 3:30 p.m. on payday shall be paid waiting time at the rate of eight (8) hours out of each twenty-four (24) hours until paid.

Payday shall be any day designated as such by the Employer. Once a payday has been designated by an Employer that payday may only be changed with the permission of the business agent.

2.    LAYOFFS.    When an employee is laid off or discharged for any cause he shall be paid in full immediately.    If forced to be paid for wages due, waiting time shall be paid as provided in the first paragraph listed under Payday.

The foreman is to be notified one (1) hour before members are to be laid off.

3.    PERMITTED TIME-OFF.    No member shall be penalized for leaving a job early to do personal business matter as long as he notifies the foreman in advance.    He shall be paid only for hours worked.

4.    TERMINATION OF EMPLOYMENT.    Should an employee be discharged, he shall be paid in full immediately and if he is discharged before 10:00 a.m. he shall receive two (2) hours pay. Should a member be discharged after 12:30 p.m. he shall receive a full day's pay except in the case of a general shut down.

5.    LABORING.    Finishers shall not finish cement and labor the same day unless paid Finisher wages for all hours worked.

6.    CONCRETE POURS.    When a pour is started all Finishers shall be on the job until completion of said job for that day including all overtime or at the discretion of the foreman.    The remaining work force shall be "Local Journeymen".

7.    SPEED LEADS.    Speed leads shall be allowed at the business agent's discretion.

19

8.    SHOW UP TIME.    If an employee reports for work at the regular starting time and is not permitted to work, he shall be paid for two (2) hours show up time.   If any employee reports for work at the regular starting time and work is started but ceased, due to bad weather, employee must remain on job site for two (2) hours to receive show up time pay, unless released by foreman or superintendent.   When an Employer requests addition workmen, and when such workmen report for work at a specified time and place, they shall be paid two (2) hours show up time in the event they are not permitted to work, weather permitting.

10.    GRINDING CONCRETE.    All contractors must furnish all equipment for rubbing, grinding and cleaning of all concrete.

11.    USE OF CONCRETE.    All concrete poured on any job site shall require a Cement Finisher, supplied to the contractor in accordance with this Agreement.

12.    LARGE JOBS.   One Finisher shall be employed for each 1250 square feet of floor space on projects planned to have 100,000 square feet of floor area or more.

13.   HAND HELD SAWS.   Hand held saws may be used at the discretion of the operator.   Should any Mason choose not to use a hand held saw the Employer shall not take any disciplinary or retaliatory action against such employee.

14.    NON-DISCRIMINATION.   Nothing in this Agreement shall be used to discriminate against any applicant for employment because of race, creed, color, religion, state of national origin, age, or physical handicap.

15.    BINDING EFFECT.   This Agreement and the terms, conditions and provisions contained herein shall bind the parties hereto and their respective representatives in interest.

16.    SEVERABILITY.   Should   any   term,   condition   and/or provision of this Agreement be held to be invalid or void by a court of competent jurisdiction then, in such event, said term, condition and/or provision shall be deemed removed from said Agreement and the remainder of the Agreement shall be full force and effect.

17. ATTORNEY'S FEES.  In the event any litigation, arbitration or claim is made by any party to this agreement, or any entity performing work hereunder, to interpret, construct or enforce the provisions hereof, or any document referred to herein, then in such event, the non-prevailing party in such litigation, arbitration or claim shall pay the prevailing parties reasonable expenses including, but not limited to, attorney's fees, court costs pre-judgment interest, witness fees and such other expenses.

IN WITNESS WHEREOF, the parties have signed this Agreement on this 6 day of May , 1993, with full and proper authority and right to do so.

21

# Bricklayers and Allied Craftsmen

## LOCAL NO. 37

### 220 W. Court Street

### Kankakee, Illinois 60901

### AGREEMENT

It is hereby agreed that a new two-year Agreement has been negotiated between the Kankakee Area Contractors Association Inc., and Bricklayers and Allied Craftsman Union Local #37 of Kankakee, Illinois. Said agreement shall be in full force and effect from June 1, 1993 through May 31, 1995 as follows:

1st Year - Wage increase of $1.05 per hour effective June 1, 1993.

2nd Year - Wage increase of $1.15 per hour effective June 1, 1994

### JUNE 1, 1993 THROUGH MAY 31, 1995

| | |
|---|---|
| WAGE | $ 20.13 |
| HEALTH & WELFARE | $ 3.22 |
| PENSION | $ 3.00 |
| TOTAL | $ 26.35 |

Working Dues Checkoff $0.40 per hour.
Residential Housing scale to be 75% of wages, full benefits.
Working Dues Checkoff to be $0.030 per hour.
.30 W.L. 5-20-93

1st Year - $1.05 per hour to be allocated at the discretion of the Local.

2nd Year - $1.15 per hour to be allocated at the discretion of the Local.

### JUNE 1, 1993 THROUGH MAY 31, 1994

WAGE
HEALTH & WELFARE
PENSION
TOTAL
WORKING DUES

$1.15 per hour to be allocated at the discretion of the local to the Health & Welfare.

Signed by and for the Kankakee Area Contractors Association Inc.

*[signatures]*

Signed by and for the Brick layers and Allied Craftsman Local #37 of Kankakee, Illinois

*[signatures]*

MEN 21 '95  14:50 BRICKLAYERS LOCAL 16 IL                ACME TILE Co.

# MEMORANDUM OF AGREEMENT

43400  371 *Jud*

THIS AGREEMENT, made and entered into at Kankakee, Illinois, by and between the

Acme Tile Co

hereinafter referred to as (EMPLOYER), and the KANKAKEE BRICKLAYERS AND ALLIED CRAFTSMEN UNION
LOCAL # 17, hereinafter referred to as the (UNION).

In consideration of the mutual promises of each other, the parties hereby AGREE as follows:

1. The EMPLOYER recognizes the UNION as the sole and exclusive collective bargaining representa-
tive for and on behalf of the employees of the EMPLOYER, now or hereafter employed within the territorial and
occupational jurisdiction of the UNION.

2. The parties do hereby adopt the latest Agreement, and all approved amendments thereto, between
the UNION and the KANKAKEE AREA CONTRACTORS ASSOCIATION, INC. and agree to be bound by all of
the terms and conditions thereof for the duration of such Agreement (and for the period of any subsequent ex-
tensions (including any amendments) which may be subsequently made, unless either party serves written notice
upon the other at least sixty (60) days prior to the stated expiration date in the Agreement or to any subsequent
expiration date of a desire to terminate this Memorandum of Agreement.

3. This Agreement shall become effective upon the date of execution.

IN WITNESS WHEREOF, the parties have executed this Memorandum of Agreement the ....21ST....

day of ....MARCH.... 19 95.

Employer: Acme Tile

Address: 3320 W Farmington Rd

City and State: Peoria IL 61604

Telephone: 309 674-5106

By: _____

TILE 16 07

EXHIBIT  B

IL 0066

**LABOR AGREEMENT**

between

**CERAMIC TILE CONTRACTORS
ASSOCIATION OF CHICAGO**

and the

**CERAMIC TILE LAYERS
AND
TERRAZZO WORKERS UNION
LOCAL NO. 67**

**OF THE**

**INTERNATIONAL UNION OF BRICKLAYERS
AND
ALLIED CRAFTSMEN**



B.A.C.

**Effective:
June 1, 2000 through May 31, 2004**

RECEIVED DEC 19 2000

## TABLE OF CONTENTS

ARTICLE I:        WORK COVERED BY THIS AGREEMENT ........................ 1

ARTICLE II:       BARGAINING UNIT RECOGNITION - UNION SECURITY ........ 2

ARTICLE III:      WAGES AND FRINGE BENEFITS ............................ 4

ARTICLE IV:       DUES CHECK OFF ....................................... 9

ARTICLE V:        HOURS OF LABOR AND PAYMENT OF WAGES ................. 10

ARTICLE VI:       PAYDAY .............................................. 12

ARTICLE VII:      TRAVEL AND PARKING ALLOWANCE ....................... 13

ARTICLE VIII:     WORKING RULES ...................................... 14

ARTICLE IX:       FOREMAN ............................................ 18

ARTICLE X:        UNION STEWARD ...................................... 18

ARTICLE XI:       APPRENTICES ........................................ 19

ARTICLE XII:      BONDS .............................................. 20

ARTICLE XIII:     SAFETY ............................................. 22

ARTICLE XIV:      HIRING ............................................. 22

ARTICLE XV:       MISCELLANEOUS PROVISIONS ........................... 23

ARTICLE XVI:      SAVINGS CLAUSE ..................................... 23

ARTICLE XVII:     SUBCONTRACTING ..................................... 23

ARTICLE XVIII:    PRESERVATION OF WORK ............................... 24

ARTICLE XIX:      NON-DISCRIMINATION ................................. 25

ARTICLE XX:       SUBLETTING ......................................... 25

ARTICLE XXI:      MOST FAVORED NATIONS CLAUSE ........................ 25

ARTICLE XXII:     SETTLEMENT OF DISPUTES ............................. 26

ARTICLE XXIII:    COMPENSATION OF JOINT ARBITRATION MEMBERS .......... 28

LABOR AGREEMENT

BETWEEN

CERAMIC TILE CONTRACTORS ASSOCIATION OF CHI-

CAGO

AND THE

CERAMIC TILE LAYERS UNION LOCAL #67

OF THE

INTERNATIONAL UNION OF BRICKLAYERS

AND ALLIED CRAFTWORKERS

This Agreement is entered into this 1st day of June, 2000, by and between CERAMIC TILE CONTRACTORS ASSOCIATION OF CHICAGO, hereinafter referred to as the "Employer", acting in their own behalf and on behalf of each of their members whose names are set forth in Exhibit "A", attached hereto and forming a part of this Agreement, and any such Employer who may hereafter join the above Association, and CERAMIC TILE LAYERS UNION LOCAL #67, of the INTERNATIONAL UNION OF BRICKLAYERS AND ALLIED CRAFTWORKERS (affiliated with the AFL-CIO), hereinafter referred to as the "Union".

This Agreement shall be in full force and effect for four (4) years from June 1, 2000, through May 31, 2004.

NOW THEREFORE, IT IS HEREBY AGREED AS FOLLOWS:

ARTICLE I
WORK COVERED BY THIS AGREEMENT

1.1    This Agreement shall apply to all work within the trade jurisdiction of the Union including but not limited to the following: The setting, slabbing or installation of all classes of tile whether for interior or exterior purposes, all burned, glazed or unglazed products; the setting, sealing and installation of prefabricated tile systems and/or panels; all composition materials, marble tiles, terrazzo tiles, warning detectable tiles, or polyester, cement tiles, Epoxy composite material,

1

corian, pavers, glass, mosaics, fiberglass, and all substitute material, for tile made in tile-like units; all mixtures in tile-like form of cement, metals, plastics and other materials that are made for and intended for use as a finished floor surface, stair treads, promenade roofs, walks, walls, ceilings, swimming pools and all places where tile is used to form a finished interior or exterior surface for practical use, sanitary finish or decorative purposes; the cutting of all material by machinery or tools on the job site; the application of a coat or coats of mortar prepared to proper tolerance to receive tile on floors, walls and ceilings regardless of whether the mortar is wet or dry at the time tile is applied to it; the setting of all tile by adhesion method with organic and/or inorganic thin-bed bonding materials where such bonding materials are applied to the backing surface and/or the back of the tile unit or sheets of tile; the installation of all bathroom, toilet room and washroom accessories built into the tile walls as the walls go up the attachment of bathroom, toilet room and washroom accessories to anchors which have been built into the tile walls as the walls go up; and all work defined as tile layers work by Article II(B) of the Constitution of the Bricklayers and Allied Craftworkers.

1.2    This Agreement shall cover the geographical area of Lake, Kane, Kankakee, Kendall, McHenry, Cook, DuPage, Will and Grundy Counties, Illinois, and such additional territory which the Union shall subsequently acquire by approval of the International Union of Bricklayers and Allied Craftsmen, provided however, as the provisions of paragraph 3.9(e) may apply.

ARTICLE II
BARGAINING UNIT-RECOGNITION - UNION SECURITY

2.1    The bargaining unit shall consist of all Journeypersons, Ceramic Tile Layers, Improvers and Apprentices engaged in work covered by the occupational jurisdiction of the Union as described above.

2.2    Employer and each individual Employer named in Exhibit "A" by and through his collective bargaining agent in response to the Union's claim that it represents an uncoerced majority of each individual Employer's employees, acknowledged and agrees (1) that there is no good faith doubt that the Union has been authorized to and

2

in fact does represent such majority of employees in each individual Employer and; (2) that the Union has demonstrated that it is the majority representative of all the employees employed by each individual Employer in that unit covered by this Agreement. Therefore, the Union is hereby recognized by each individual Employer named in Exhibit "A" as the sole and exclusive collective bargaining representative under section 9(a) of the National Labor Relations Act for the employees now and hereafter employed in the bargaining unit of each individual Employer named in Exhibit "A" with respect to wages, hours of work and other terms and conditions of employment.

2.3   All employees now included in the bargaining unit represented by the Union and having membership therein must, during the term hereof, as a condition of employment, maintain their membership in the Union. The Local Union shall be notified by the employer of all other employees performing work covered by this Agreement who then shall, as a condition of employment, become members of the Union at the discretion of the union after the seventh day but not later than the eighth day following the beginning of such employment, or the effective date of this Agreement, whichever is later and they shall maintain such membership as a condition of continued employment.

2.4   Employees who do not become members of the Union as required above, or whose membership is terminated by the Union by reason of the failure of the employee to tender or pay initiation fees and periodic dues uniformly required as a condition of acquiring and retaining membership, shall not be continued in the employ of any Employer under this Agreement.

2.5   Inasmuch as the Union has submitted proof and the Employer is satisfied that the Union represents a majority of it's employees in the bargaining unit described herein, the Employer recognizes the Union as the exclusive collective bargaining agent under Section 9(a) of the National Labor Relations Act for all employees within that bargaining unit, on all present and future job sites within the jurisdiction of the Union, unless and until such time as the Union loses its status as the employee's exclusive representative as a result of an NLRB election requested by the employees. The Employer agrees that it will not request an NLRB election.

3

## ARTICLE III
## WAGES AND FRINGE BENEFITS

3.1   An increase of $1.55 per hour in wages and fringe benefit contributions for the period June 1, 2000, through May 31, 2001, shall be paid as follows: (Fringe Benefit Contributions are payable "per hour worked" or "per hour paid" as hereinafter indicated, and any part of an hour shall be reported and paid as a full hour)

ADDITION:   $3.50 per day or part thereof general expense for the first and second years of this agreement, $4.00 per day or part thereof general expense for the third and fourth years of this agreement.

Wages                                          27.55  Per Hour

Fringe Benefit Contributions Payable
Chicago Tile Institute Welfare Plan ............... $ 3.00 Per Hour Worked
Chicago Tile Institute Pension Plan ............. $ 1.20 Per Hour Worked
Chicago Tile Institute Promotion Fund ......... $ .08 Per Hour Worked
Ceramic Tile Layers Apprenticeship Trust ........ $ .17 Per Hour Paid
Bricklayers and Trowel Trades
  International Pension Fund ............................. $ .75 Per Hour Paid
International Masonry Institute ......................... $ .32 Per Hour Paid
IL Dist. Council #1 Annuity Fund ...................... $ 2.25 Per Hour Paid

3.2   For work performed during the period June 1, 2001, to May 31, 2002, wages and fringe benefits shall be increased by a total of $1.55 per hour and shall be allocated between wages and fringe benefit contributions (including a contribution to the Ceramic Tile Layers Apprenticeship Trust) solely at the option of the Union. Notice in writing of the allocation shall be sent to the Employer prior to May 31, 2001.

3.3   For work performed during the period June 1, 2002, to May 31, 2003, wages and fringe benefits shall be increased by a total of $1.56 per hour and shall be allocated between wages and fringe benefit contributions solely at the option of the Union. Notice in writing of the allocation shall be sent to the Employer prior to May 31, 2002.

3.4 For work performed during the period June 1, 2003 to May

4

31, 2004, wages and fringe benefits shall be increased by a total of $1.58 per hour and shall be allocated between wages and fringe benefit contributions solely at the option of the Union.
Notice in writing of the allocation shall be sent to the Employer prior to May 31, 2003.

3.4(a)  The wages of an Apprentice shall be based on hours worked on the following percentage of Journeyman scale:

| | | |
|---|---|---|
| 1st 1000 hours = 50% of Journeyman Scale | (1st level) |
| 2nd 1000 hours = 60% of Journeyman Scale | (2nd level) |
| 3rd 1000 hours = 70% of Journeyman Scale | (3rd level) |
| 4th 1000 hours = 80% of Journeyman Scale | (4th level) |
| 5th 1000 hours = 90% of Journeyman Scale | (5th level) |
| 6th 1000 hours = 95% of Journeyman Scale | (6th level) |

3.5  Welfare, Pension and Apprenticeship Plans
Employer agrees to be bound by the Agreement and Declaration of Trust establishing the Chicago Tile Institute Welfare Plan; Chicago Tile Institute Pension Plan and Ceramic Tile Layers Apprenticeship Trust and any amendments thereto, and designates his representative on the Board of Trustees of such plans such Trustees as are named in said Declaration of Trust, as Employer Trustees, together with their successors and agrees to be bound by all action taken by the Board of Trustees of each said Trust.

3.6  Chicago Tile Institute Promotion Fund is a Trust established, administered and operated only by management representation solely for the purpose of promoting the Ceramic Tile industry. It shall not promote any one Employer, group of Employers or associations of Employers, excepting the National Promotion Fund of the Ceramic Tile industry. Funds of the Trust shall not be used for purposes against the Union or any of its agents or to defray any costs of collective bargaining with the Union. Inasmuch as the existence and utilization of such fund should result in the increased need for the Ceramic Tile Layers, thereby providing additional work and the possibility of better wages for Ceramic Tile Layers, the Union agrees to cooperate to the fullest extent in assuring that the contributions agreed

5

to in this Article are in fact made by Employers bound by this Agreement.

3.7  Bricklayers and Trowel International Pension Fund was established under an Agreement and Declaration of Trust dated July 1, 1972. Employer hereby agrees to be bound by and to the said Agreement and Declaration of Trust and Plan, as though he had actually signed the same. Employer hereby irrevocably designates as its representatives on the Board of Trustees, such Trustees as are now serving or will in the future serve, as Employer Trustees, together with their successors. The Employer further agrees to be bound by all, actions taken by the Trustees pursuant to the said Agreement and Declaration of Trust.

3.8  International Masonry Institute was established under an Agreement and Declaration of Trust dated March 14, 1981. Employer hereby agrees to be bound by and to said Agreement and Declaration of Trust as though he had actually signed the same. Employer hereby irrevocably designates as its representatives on the Board of Trustees, such Trustees as are now serving as Employer Trustees, together with their successors. The Employer further agrees to be bound by all actions taken by said Trustees.

3.9  Annuity Fund was established under an Agreement and Declaration of Trust dated June 1, 1990. Employer hereby agrees to be bound by and to said Agreement and Declaration of Trust as though he had actually signed by same. Employer hereby irrevocably designates as its representative on the Board of Trustees, such Trustee as are now serving as Employer Trustees, together with their successors. The Employer further agrees to be bound by all actions taken by said Trustees.

3.10  Payment of Contributions and Delinquencies.
(a)  Reports. Payments of contributions as provided in this Article III shall be made upon forms of the Chicago Tile Institute Welfare, Pension and Promotion Fund; the Ceramic Tile Layers Apprenticeship Trust; the Bricklayers and Trowel Trades International Pension Fund, International Masonry Institute, and the Illinois District Council No. 1 Annuity Fund shall be payable on or before the twelfth (12th) day of each month, or as each Trust may from time to time

6

designate, covering all work performed in the preceding month. Monthly reports are required of Employer irrespective of whether he employed any employees during the preceding month. If no employees were hired, the report shall so state.

(b)    Delinquencies. An Employer becomes delinquent upon failure to make timely payments of contributions as it is required in each of the Trusts and Funds described in this Article III. If contributions, in full, are not received by the 12th day of the month worked for the preceding month, Employer shall pay in addition to the aforesaid hourly contributions:

(i)    10% of the amount due as liquidated damages for failure to pay in accordance with this Agreement, it being understood and agreed that damages resulting from such late payments are substantial but are difficult if not impossible to ascertain; additionally liquidated damages for the Illinois District Council #1 Annuity Fund are 5% per month.

(ii)   interest on all outstanding balances computed at the prime rate on the day of the delinquency occurred; additionally interest for the Il. D.C. #1 Annuity Fund is computed at the rate of prime plus 1%.

(iii)  all reasonable legal, auditor and other charges incurred in effectuating payment; and

(iv)   if a contractor is three (3) months delinquent, they may be audited at the contractor's expense.

(v)    if a contractor makes payment to a fund with a NSF check, said contractor will be obligated topay a $25.00 fee to each fund that received the NSF check. Payment is to be made within 15 days of notification.

7

(vi)   any and all contractor's who are delinquent 2 (two) months will not receive any members of Local #67 for work. Any and all contractors who are delinquent 2 (two) months will have Local#67 members pulled from their shops.

If delinquency continues for forty-eight (48) hours after written notice of such delinquency is mailed or delivered to the delinquent Employer, the Employer shall be liable for claims to the extent of benefits to which the employee would have been entitled if the Employer had made the required contributions, and for all contributions and liquidated damages due thereunder, plus all reasonable legal fees incurred by the Trust Funds in enforcing the payment thereof.

It shall be considered a violation of this Agreement for any Employer to fail to pay or comply with any provisions of this Article III, or any rule or regulation made by the Trustees administering the aforesaid Trusts and Funds. In the event that the Union receives written notice from the Trustees of any of said Trusts and Funds that the Employer has failed to pay in full any sum due said Trustees and Funds under this Article, and that such failure has continued for forty-eight (48) hours after an Employer has received written notice thereof, the Union may withdraw employees from such Employer's employment until all sums due from the Employer under this Article have been paid in full. This remedy shall be in addition to all other remedies available to the Union and the Trustees, and may be exercised by the Union, anything in this collective bargaining Agreement to the contrary notwithstanding. Such withdrawal of employees to collect contributions to said Trusts and Funds shall be not be considered a violation of this Agreement on the part of the union and it shall not be considered a matter subject to resolution under the Settlement of Disputes Provision of this Agreement. If employees are withdrawn from any Employer under the Section, the employees who are affected by such stoppage of work shall be paid for lost time up to sixteen (16) hours provided that two (2) days notice of the intention to remove employees from a job is given to the Employer by the Union by registered or certified mail.

(c)    Audits. The Employer shall furnish to any of the

8

aforementioned Trusts and Funds or any agent of the Union, upon request, such information and reports as they may require in the performance of their duties. The Trustees of each of the Funds named above, or the Union, or any authorized agent of their, shall have the right at all reasonable times during business hours to enter upon the premises of the Employer and to examine and copy such books, records, papers, weekly payroll journals, individual earning records, quarterly tax returns and reports of the Employer as may be necessary to permit the Trustees of the Union to determine whether Employer is fully complying with the provisions regarding Employer contributions to each of the Trusts and Funds named herein. Any Employer found delinquent through regular or special audit ordered by the Trustees shall be charged the full cost of such audit.

(d)    Enforcement.  The trustees and the Union are hereby given the power and the authority to institute whatever legal proceedings may be necessary to enforce compliance with the provisions of this Article.  Legal and auditing fees incurred by any of the aforementioned Trusts and the Union in enforcing compliance with this Article shall be charged to the delinquent Employer.

(e)    Covered Work.  The fringe benefit contributions provided in paragraph 3.1, 3.2 and 3.3 above, are payable for covered work performed, within or outside of the geographical area described in paragraph 1.2 above.

### ARTICLE IV
### DUES CHECK OFF

The Employer shall deduct from the wages of each employee who has signed a check-off authorization form to the Union (or to any agencies designated by said Union for the collection of such money), the sum for each hour paid which the Union has specified, or specified from time to time and so advises the Employer in writing, as the portion of each employee's dues subject to check-off, made payable to the Union, Illinois District Council No. 1, its International Union, or any other affiliate of its International Union, as designated from time to time by the Union.  The sums transmitted shall be accompanied by a statement, in form specified by the Union, reporting the name of such

9

person whose dues are being paid and the number of hours each employee has been paid.

### ARTICLE V
### HOURS OF LABOR
### AND
### PAYMENT OF WAGES

5.1    Eight continuous hours shall constitute a day's work, between the hours of 7:00 a.m. and 3:30 p.m. or 8:00 a.m. to 4:30 p.m. shall be a regular work day.  The work day shall include a one-half hour lunch period and a fifteen minute morning coffee break.  Quitting time shall be eight and one-half hours after the starting time, which shall include 15 minute clean-up time.  A work week shall consist of five days, Monday through Friday, inclusive.

5.2    Wages for any work in excess of eight hours in any one day, Monday through Friday, (excluding Holidays) shall be paid at the rate of double time, with the following exceptions:  Work required Monday through Friday from either 3:30 p.m. or 4:30 p.m. to 6:30 p.m. or 7:30 p.m., shall be paid at time and a half only in situations such as where a mechanic is in the process of installing mud walls or mud floors or to complete a job so that the mechanic or crew may start a new job on the following day and only when the Union is notified (when possible).  The use of this clause is not intended to be abused or used for any other purpose other than that outlined above.  Wages for any work from 3:30 p.m. (in case of an advanced starting time) or 4:30 p.m. (in case of a regular starting time) to 7:00 a.m. or 8:00 a.m. respectively, Monday through Friday, shall be paid at the rate of double time.  Work between the hours of 7:00 a.m. or 8:00 a.m. and 3:30 p.m. or 4:30 p.m. on Saturday shall be paid at the rate of time and one-half.  Work between the hours of 3:30 p.m. or 4:30 p.m. on Saturday through 7:00 a.m. or 8:00 a.m. on Monday shall be paid at the rate of double time.  All work on legal holidays shall be paid at the rate of double time.  Any member of Local #67 who works during a overtime period, and then continues to work into a normal straight time period will receive pay at overtime rate during the overtime period and straight time during straight time period.  The Employer shall notify Local 67 of all overtime.  All paychecks shall include a pay stub itemizing all deductions from

10

gross wages, including tax deductions, union dues, and annuity contributions.

    5.3    Shift Work. A pre-job conference shall take place between the Business Manager and Employer regarding any shift work at least seventy-two hours prior to commencement of the work.

When approved by the Union and when work is carried on two (2) or more shifts, the second shift shall receive eight (8) hours pay for seven and one-half (7 1/2) hours' work, plus a paid 1/2-hour lunch period. The third shift shall receive nine (9) hours' pay for eight (8) hours' work, plus a paid 1/2-hour lunch period.

No shift work shall be allowed unless the job be of at least five (5) business days' continuous duration. A job must start as a shift job and end as a shift job.

Any work done in excess of eight (8) hours on the first and in excess of seven and one-half (7 1/2) hours on the second shift and in excess of eight (8) hours on the third shift shall be paid wages at the rate of double time.

No employee shall work more than one shift in any twenty-four hour period.

| Monday through Friday: | | Wages |
|---|---|---|
| Shift #1 | 8:00 a.m. to 4:30 p.m. ............................ | 8 hours |
| Shift #2 | 4:30 p.m. to Midnight ............................ | 8 hours |
| Shift #3 | Midnight to 8:00 a.m. ............................ | 9 hours |

Saturdays, all shifts shall be paid at time and one-half.

Sundays and Holidays, all shifts to be paid at double-time.

    5.4    Saturday Make-UP Day. On exterior work requiring three or more Tile Layers, in the event men assigned to the job are caused loss of time by weather conditions only, and have less than 24 hours pay accumulated for the week shall be allowed to work Saturday at

11

straight time pay if they so agree and Local 67 is notified ahead of time. In the event the contractor wishes to add more Tile Layers than those who have worked on the job, the rate of pay shall be at the overtime rate of time and one-half for all. Sunday shall not be allowed as a make-up day. No disciplinary action shall be taken against any employee not working a make-up day.

    5.5    Legal Holiday shall consist of the following: New Years Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day, and Christmas. It shall be understood that the holidays enumerated shall be celebrated according to the Federal designation.

    5.6    Any Tile Layer transferring from one job to another for the same Employer during a scheduled working day shall do so on the Employer's time.

    5.7    Employees who have worked thirteen (13) consecutive days shall be required to take the fourteenth day off.

## ARTICLE VI
## PAYDAY

    6.1    Work week to be paid on the basis of all hours earned between Sunday and Saturday of each week, including all overtime or premium time hours earned up to midnight Saturday. Payment may be made by check mailed to home of employee postmarked no later than Wednesday, postage prepaid. Employer must furnish timecards. Time must be reported no later than Tuesday noon in order to be paid wages earned for previous week. In the event timecard is late, wages shall be paid the following week.

    6.2    When an employee is laid off or quits, he may report hours worked by telephone, to be followed by timecards. The employer shall issue the paycheck by the following Wednesday.

    6.3    In the event the Employer fails to notify the Union by noon of day of discharge and employee cannot find employment on the following work day, the Employer shall pay said employee an amount equal to four (4) hours' pay, to be paid on the final paycheck.

12

6.4    When an employee is fired, he must report his time and shall receive immediate payment for wages due.

6.5    When an employee is laid off or fired and is working for a contractor who is out of our jurisdiction, he shall call in his time and have a check sent to him by express mail.

## ARTICLE VII
## TRAVEL AND PARKING ALLOWANCE

7.1    General Expense.  Employer shall pay an allowance to all employees in the amount of $3.50 per day for each day, or part thereof for work performed within a 90-mile radius of Chicago (State and Madison Streets) and $4.00 per day general expense starting in the 3rd year of this agreement. For work outside that zone, Employer shall in addition to said allowance pay current IRS standard allowance for each mile traveled commencing with the 90 mile radius from State and Madison Streets in Chicago, to be revised yearly starting June 1, 2000.

7.2    Out-of-State Pay Allowance.  Employees who perform work outside the State of Illinois, except a portion of Indiana that would be annexed into the (8) hour zone, East to Route 65, South to Route 30, shall receive shall receive nine (9) hours pay for eight (8) hours work as out-of-town work as defined below.

7.3    Out-of-Town Work Allowance.  Out-of-Town work is described as work in excess of 90 miles from Chicago (State and Madison Streets).  Employees assigned to such work shall receive the following allowances for the entire period of the assignment.

(a)  $35.00 per day for board;
(b)  Lodging expenses at the prevailing double occupancy room rate;
(c)  Transportation expenses equivalent to the air fare;
(d)  Round trip transportation expense every four weeks of the assignment.
(e)  Any member working in excess of ninety (90) miles of State & Madison in Chicago, Illinois, will receive nine (9) hours pay for eight (8) hour work provided

13

he or she is commuting the distance and not staying over. (The allowances provided in paragraphs 7.1 and 7.2 above do not apply for out-of-town work)

7.4    Downtown Chicago Parking Fees.  (1ST YEAR OF AGREEMENT ONLY).  Employer pays parking for the first and last day of work in the first year of this agreement and a,b,c and d listed below shall apply, however starting in the 2nd year of this agreement any parking paid within our entire geographic jurisdiction will be reimbursed up to $12.00 per day with receipt.  Also, it is understood that general expense will not be paid starting in the 2nd year of this agreement if parking is being paid. Additionally starting in the 2nd year of this agreement there will be no reference to gang boxes or secure storage areas.

(a)  If no gang box or secure storage area is provided, Employer pays the fee at the closest parking facility for each day of work.
(b)  If a gang box or secure storage area is provided, no parking fee is payable except for the first and last day, but Employer shall pay the fee whenever employee is transferred on order of Employer to another job and tools are required to be transported.
(c)  Receipts must be submitted to receive payment.
(d)  Current general expense is paid above and beyond any parking being paid in 1st year of this agreement only.

7.5    When a Local 67 member goes to work in another local's jurisdiction for a contractor under that local's jurisdiction, the member is entitled to that local wage package only.

## ARTICLE VIII
## WORKING RULES

8.1    Tile Layers reporting for work upon order expressed by Employer and not put to work for any reason except weather conditions, fire, accident or other unavoidable causes shall receive two (2) hours pay for lost time plus parking or general expense.

14

8.2    Tile Layers reporting on job where conditions are such that he cannot proceed to install tile shall contact his Employer as soon as possible, further instructions to be given by Employer.

8.3    All Employers shall furnish to the Tile Layers proper working instructions in writing, covering all work to be done on any and all jobs. These instructions shall give name of room, or rooms that work is to be done in, size, grade and kind of tile to be used, method of installations and on a complicated piece of work, a setting plan shall accompany working instructions.

8.4    All tile work shall be installed in accordance with the standards of installations accepted by the Joint Arbitration Board.

8.5    Tile Layers reporting to shop or office of Employer for orders at the beginning of any scheduled working day shall be paid commencing with the time he reports in accordance with the Agreement.

8.6    Piece work, lump work, bargaining or contracting for certain amounts of work to be done in a designated time, or any subterfuge to evade the intent of this paragraph, are all prohibited.

8.7    All installations regardless of the quality or kind of tile or method of installation shall be made in a first class manner. Whenever a Tile Layer shall do faulty work, it shall be the duty of the Business Representative to investigate with a representative of the Employer within 48 hours. The Employer shall have forty-eight (48) hours to file said complaint with the Union after Employer received complaint. If the Business Representative finds that the complaint is justified, he shall order the Tile Layer to repair said work on his own time within ten (10) working days. The Employer shall furnish all replacement materials.

8.8    The employees are required to carry all hand tools to perform their trade. Employer shall supply employees with all the other tools required to perform the assigned work, including but not limited to: All electrical power tools, electrical extension cords in excess of two fifty-foot cords, soaking tubs, straight edges, laths, mixing boxes, mortar boards, kneeling boards, stands, hand operated table cutters

15

in excess of 8" tile size, and all cutting wheels. The following is a list of tools and equipment which could be used by a Ceramic Tile Layer, however, if owned by the Employer and hauled by the tile layer, the tile layer will receive $10.00 per day compensation. Hauling will be at the discretion of the tile layer.

1. Wet Saw
2. Straight Edges-over 8' or does not fit in car
3. Hand truck
4. Wheelbarrow
5. Scaffolding and ladders
6. Tarps-insulated
7. Mortar boards and stands
8. Kneeling boards-more than four boards
9. Laser equipment-requiring a tri-pod
10. Water barrels
11. Hoses-in excess of 150'
12. Shop owned racks
13. Mixing boxes
14. List of equipment that does not fit in truck or trunk properly and safely.

ANY MATERIALS DELIVERED BY THE TILE LAYER FOR THE EMPLOYER ALSO FALL UNDER THIS CATEGORY.

Employer may require employee to sign for tools and equipment furnished by Employer. Tools supplied by contractor shall be signed out by the Tile Layer. He shall be responsible for monetary compensation (Pro-Rated) if tool is lost. Tile Layers shall not be responsible in cases of thievery. A police report must support the claim.

8.9    Hauling Shop Tools and Equipment. If a tile layer hauls large tools in his personal vehicle, he shall receive $10.00 per day hauling charge in addition to general expense.

8.10    Clothing Expense Allowance. Contractor will provide coveralls or dollar amount per day for pants, shoes, etc., when member is working with tar-based materials, Alcor, and Furnan.

16

8.11  Out of Town Contractors.  If a contractor has his or her primary office within the jurisdiction of the Union, he shall be classified as a local contractor.  Any firm whose office or place of business is located outside of the firm's jurisdiction, may, whenever they are doing work within the Union's jurisdiction, bring in one (1) non-resident journeyperson, but after the first 8 hour day, Monday-Friday, 7:00 am to 3:30 pm, must employ at least one (1) journeyperson from the Union until the end of the job.  An out of town contractor must hire Local #67 members at the start of any overtime job.  No first day privilege is granted on overtime work.  The non-resident journeyperson shall furnish evidence to the Business Representative that he/she is receiving the prevailing wages that are being paid under this contract. .Non-resident journeypersons must report to the Union office the morning the job starts, before he/she commences work on the job.  Members of other tile local unions, when working within the jurisdiction of this local Union, must furnish to this Union the weekly job site report form furnished by this Union to be received by the Union no later than the Monday following the previous week's work.  These weekly reports must confirm the monthly contractor reports submitted to the Chicago Tile Institute.  Failure to comply with this provision will subject the offender to rejection of his/her right to work in this jurisdiction.

8.12  Union reserves the right to request of Employer that it complete and submit weekly report forms on all employees working within the trade and geographical jurisdiction of the Union.  Such requests for reporting will only be demanded upon a reasonable showing that such Employer is not abiding by the terms and conditions of this Agreement.  The reporting forms shall be supplied by the Union.  Employer agrees to complete them for the period requested by the Union.

8.13  Safety Meetings shall be limited to one (1) hour per meeting with no more than four (4) meetings per year.  All such meetings shall be during regular business hours with employee receiving regular compensation.  Safety meetings between the Union and Management shall meet at least once (1) per calendar year on a Saturday.

17

## ARTICLE IX
## FOREMAN

9.1  A foreman shall be a journeyperson Tile Layer. Whenever two (2) Tile Layers are employed on any one job, one (1) shall be selected by the Employer as a foreman.  Whenever five (5) or more Tile Layers are employed on any one job, the foreman shall receive $2.00 per hour above the regular Tile Layers' wages.  His/her duties are to keep daily work reports on forms supplied by the Employer.  Reports shall state day, date, hours worked and areas assigned to Tile Layers.  He shall have the right to order Tile Layers and/or helpers to leave the job.

9.2  It is further agreed that the Business Representative of the Union or the authorized agent of the Trustees of the Chicago Tile Institute shall be allowed to visit the job during normal working hours to interview foremen, contractors, superintendents or men at work.  Discretion shall be used by Business Manager as to not to interfere with progress of work.  The Union shall have the right to appoint a Steward from the shop that has the work and he is to be responsible for the tile trade only.

## ARTICLE X
## UNION STEWARD

10.1  The Business Representative of the Union shall appoint a job steward on each job who shall not be subject to discrimination for discharging his duties and shall be the last remaining employee working at the job site, other than the foreman, providing he can perform the work remaining to be performed.

10.2  The Union Steward shall see that every man on the job is in good standing with this Union or see the proper credentials which will permit him to work on the job.

10.3  The Union Steward shall keep the Business Representative informed of the needs of the Employer so that he may supply additional workers when required.

10.4  The Union Steward shall keep a record of the men

18

employed, laid off, or discharged and report on the proper forms to the Union at each regular meeting.

10.5  The Union Steward shall address all grievances on the job and attempt to resolve them.  In the event the grievance cannot be resolved by the Union Steward, he shall notify the Business Representative.

10.6  The Union Steward shall see that the provisions of this Agreement are complied with at all times and shall report any violations to the Business Representative.

10.7  The Union Steward shall examine all working dues books or "permits" when a tile layer begins work and weekly thereafter.

10.8  When an employee is discharged, the Union Steward shall be given reasons for the discharge by the Employer and/or Foreman prior to the discharge.

10.9  When twenty-five (25) or more employees covered by this Agreement are employed on a job site, the Union Steward shall not use his tools.

10.10  The Union Steward shall see that any injured employee shall receive proper care at the expense of the Employer and shall collect all relevant facts regarding the injury.  The Union Steward shall report every injury to the Business Representative and shall accompany the injured employee to the hospital or his home without loss of pay.

10.11  A Union Steward shall be appointed once there are four (4) tile layers on a job.

10.12  A Union Steward may be required on any job. The Union reserves the right to appoint a steward on any job.

### ARTICLE XI
### APPRENTICES

11.1  In order to maintain a sufficient number of skilled

19

mechanics, the necessity for employment of apprentices is hereby recognized and the employment and proper training for as many apprentices as is reasonable and practicable shall be encouraged by all parties to this Agreement.

11.2  Apprentices are indentured to the Board of Trustees of the Apprenticeship program and the International Masonry Institute hence are under the complete control and jurisdiction of those Boards of Trustees.  An Employer shall not discharge or refer apprentices to another Employer without first obtaining permission from the said Board of Trustees.

11.3  Employer may employ a maximum of one (1) apprentice for each three (3) journeymen when apprentices are available.  This ratio shall be based on current work force and not on annual or average work force.  The ratio of any one job shall never be more than one (1) apprentice for one (1) journeyperson.

### ARTICLE XII
### BONDS

12.1  Each Employer shall furnish the Union, not later than the 5th day following the execution of this Agreement, a Surety Bond or a Letter of Credit in the principal sum as shown below.  Such Bond shall be written by an insurance carrier licensed to do business in the State of Illinois.  Obligees on the Surety Bond shall be as follows:

Chicago Tile Institute Welfare Fund;

Chicago Tile Institute Pension Fund;

Chicago Tile Institute Promotional Fund;

Bricklayers and Trowel Trades International Pension Fund;

Illinois District Council #1 Annuity Fund;

Ceramic Tile Layers and Terrazzo Workers Union

Local No. 67 Apprentice Fund;

Chicago Tile Layers Union Local 67;

20

The principal amount of said Surety Bond shall be for Local #67 Tile Layers and Local #25 Tile Finishers:

| | |
|---|---|
| One (1) to four (4) employees | $ 12,000.00 |
| Five (5) to ten (10) employees | 24,000.00 |
| Eleven (11) to fifteen (15) employees | 34,500.00 |
| Sixteen (16) or more employees | 50,000.00 |

12.2  Any Employer who fails to have sufficient funds on deposit to meet all pay checks issued to employees covered by this Agreement shall be subject to a penalty fixed by the Joint Arbitration Board. Said penalty shall be to the extent of a sum not less than the expense incurred in collecting the amounts due on wages, fringe benefits and dues, and the Employer shall also be deprived of the right to pay by check. In case of a forfeiture of his Surety Bond, he shall be required to execute a new surety Bond acceptable to the Union.

12.3  Employer agrees to elect to be bound by the provisions of the ILLINOIS WORKMEN'S COMPENSATION ACT and shall furnish a certificate of such insurance to the Union.

12.4  Employers not otherwise required to pay contributions under the ILLINOIS UNEMPLOYMENT COMPENSATION ACT and irrespective of the number of employees, shall voluntarily elect to become subject to said act and make the necessary payments thereunder. Employer shall furnish Union with the number assigned to him by the State of Illinois.

12.5  Employer shall give notice to the Union in writing via certified or registered mail not later than ten (10) days after the occurrence of any of the following events relating to the Employer, occurring after the date hereof:

Formation of Partnerships;
Termination of Business;
Change in names commonly used in business operation;
Change in form of business organization;
Incorporation of business;
Dissolution of Corporation or Partnership;
Filing Under US Bankruptcy Code

21

12.6  This Agreement shall not be transferable either by action of Employer or by operation of law. In the event any Employer whether an individual, partnership or corporation covered by this Agreement, merges, consolidates or transfers a controlling interest in his, their or its business, this Agreement may be canceled to such Employer by the Union.

12.7  All contractors must have a letter on file in the Union office listing the names of all persons who have authorization to act in the capacity of employing and terminating workers for his firm. The Union must be notified before noon by the Employer and the employee by 3:30 p.m. on the same day of termination of employment.

12.8  The provisions of Section 1.2 to the contrary notwithstanding, Employer agrees that employees who are assigned to work outside the geographical area of this Agreement shall work under the provisions of this Agreement, and wages shall be the highest wage rate to prevail.

## ARTICLE XIII
### SAFETY

13.1  No Tile Layer shall be required to work under conditions that are in violation of O.S.H.A. Employees shall become acquainted with O.S.H.A. requirements for the ceramic tile trade.

13.2  No Tile Layers shall be required to walk up more than eight (8) flights of stairs.

13.3  Any tile layer working with a diamond cutting saw shall have water applied to the cutting at all times. Dry cutting is prohibited.

## ARTICLE XIV
### HIRING

The Union does not operate an exclusive Hiring Hall. Employers are free to hire union ceramic tile layers from any source. Employees may seek and obtain employment as they wish without having to register on any Union availability list or get Union permission. The Employer

22

and the Tile Layer are required to call the Union office and report new employment within 24 hours.

### ARTICLE XV
### MISCELLANEOUS PROVISIONS

15.1 Employer agrees that by appointment, and within forty-eight (48) hours of notice, he or his appointed agent will meet, during normal working hours at Employer's office or shop, with anyone designated by the Business Manager of the Union for the purpose of determining whether the provisions of this Agreement are being fulfilled.

15.2 Employer agrees that all unit work will be performed by unit employees.

15.3 The Tile Layers shall not be required to pick up or deliver any tile or other materials related to their work.

### ARTICLE XVI
### SAVINGS CLAUSE

Should any part of, or any provisions herein contained be rendered or declared invalid by reason of any existing or subsequently enacted legislation, or by any decree of a court of competent jurisdiction, such invalidation of such part or portion of this Agreement shall not invalidate the remaining portions hereof. Upon such invalidation, the parties hereto agree to immediately meet to re-negotiate such parts of provisions affected. The remaining parts or provisions shall remain in full force and effect.

### ARTICLE XVII
### SUBCONTRACTING

17.1 The Employer agrees not to sublet, assign or transfer any work covered by this Agreement to be performed at the site of a construction project to any person, firm or corporation, except where the subcontractor subscribes and agrees in writing to be bound by the full terms of this Agreement and complies will all of the terms and conditions of this Agreement.

23

17.2 All charges of violation of this Article shall be considered as a dispute and shall be processed in accordance with the provisions of this Agreement covering the procedures for the handling of disputes and the final and binding arbitration of disputes.

### ARTICLE XVIII
### PRESERVATION OF WORK

18.1 In order to protect and preserve for the employees covered by this Agreement, all work heretofore performed by them, and in order to prevent any device or subterfuge to avoid the protection and preservation of such work, it is hereby agreed as follows: If and when the Employer shall perform any work of the type covered by this Agreement at the site of a construction project, under its own name or under the name of another, as a corporation, company, partnership, or any other business entity, including a joint venture, wherein the Employer (including its officers, directors, owners, partners or stockholders) exercise either directly or indirectly (such as through family members) and significant degree of ownership, management or control, the terms and conditions of this Agreement shall be applicable to such work.

18.2 All charges of violations of this Article shall be considered as a dispute under this Agreement and shall be processed in accordance with the procedures for the handling of grievances and the final binding resolution of disputes, as provided in Article XX of this Agreement. As a remedy for violations of this Section, the arbitrator (or arbitration body) provided for in Article XX is empowered, at the request of the Union, to require an Employer to (a) pay to affected employees covered by this Agreement, including registered applicants for employment, the equivalent of wages lost by such employees as a result of the violations, and (2) pay into the affected Joint Trust Funds established under this Agreement, any delinquent contributions to such Funds which have resulted from the violations including such liquidated damages and interest as may be prescribed by the Trustees or by this Agreement or by law. Provisions for this remedy herein does not make such remedy the exclusive remedy available to the Union for violation of this Section; nor does it make the same or other remedies unavailable to the Union for violations of other sections or articles of this Agreement.

24

18.3 If, as a result of violation of this Article, it is necessary for the Union and/or the Trustees of the Joint Trust Funds to institute court action to enforce an award rendered in accordance with the paragraph above, or to defend an action which seeks to vacate such award, the Employer shall pay accountant and Attorneys fees incurred by the Union and/or the Fund Trustees, plus costs of the litigation, which have resulted from the bringing of such court action.

## ARTICLE XIX
## NON-DISCRIMINATION

Neither party to this Agreement shall discriminate against any employee or any Employer covered by this Agreement by reason of said person's gender, race, color, religious affiliation, national origin or any other basis prohibited by law. The provisions of this Agreement relating to Settlement of Disputes shall apply to any charge made by any party of a violation of this provision.

## ARTICLE XX
## SUBLETTING

It shall be the duty of all persons letting or subletting ceramic tile installation to ascertain that the contractor or sub-contractor is reliable, financially responsible, and will comply with the provisions of this Agreement. All persons letting or subletting tile installation work shall assume the responsibility for payment of all fringe benefits, in the event his contractor or sub-contractor fails in making payments or contributions; provided, however, that the Union notifies the person letting or subletting said work, in writing, of any such delinquency within 30 days of the delinquency and provided also that to help assist the Union, the person letting or subletting such work shall notify the Union of the contractor or sub-contractor to whom the work was sublet and the name and location of the project.

## ARTICLE XXI
## MOST FAVORED NATIONS CLAUSE

If during the term of this Agreement, the Union enters into a collective bargaining agreement with another construction industry

25

Employer or group of Employers employing ceramic tile layers and apprentices which provides for wage rates or economic fringe benefits or work rules more favorable to such Employer than the corresponding provisions of this Agreement, the parties to this Agreement will meet promptly to draft an amendment to this Agreement incorporating such more favorable provisions, except however, that the provisions hereof shall not apply to more favorable wage rates, contract terms or work rules granted to Employers in the Ceramic Tile Industry or to public sector Employers.

## ARTICLE XXII
## SETTLEMENT OF DISPUTES

22.1  The following provisions shall apply to the settlement of disputes:  (Except for matters involving payment of welfare, pension and apprenticeship training contributions under Section 3.1, 3.2 and 3.3 above).

(a)    In case a dispute shall arise between Employer and the Union, including but not limited to jurisdictional disputes, the violation, interpretation and application of this Agreement, and the Employer and the Union cannot resolve the dispute within 72 hours after it arises, then the dispute shall be referred to the Joint Arbitration Board for the consideration in the manner hereinafter provided:

(b)    There shall be a Joint Arbitration Board consisting of three (3) representatives of the Union and three (3) representatives of the Ceramic Tile Contractors Association. A quorum of the Joint Arbitration Board shall be two members from the Union and two members from the Association, but neither side shall cast more total ballots than the other. A decision shall require a majority vote and any such decision shall be binding on both parties. If, no ruling is rendered by the Joint Arbitration Board within ten (10) days of the time the dispute was first referred to it, the Joint Arbitration Board shall be deemed to have failed to have reached a decision unless the parties to the dispute agree to an extension of time.

(c)    In the event that a dispute has been referred to the Joint Arbitration Board and is either refused by the Board or no decision is reached by the Board within the time limits described above, either party may submit the dispute to binding arbitration by:

(i)    Informing the other party of such

26

submission and requesting the American Arbitration Association to submit a panel of five (5) arbitrators available to hear and decide the issue. The party requesting such panel shall upon receipt of the five (5) names, strike one (1) name from the list and submit the remaining four (4) names to the other party, who shall strike one (1) additional name. The parties shall alternatively strike names thereafter until one remains, who shall be the arbitrator.

(ii)    The parting requesting arbitration shall then assume the responsibility of procuring the services of the arbitrator in accordance with the procedures of the American Arbitration Association. The arbitrator shall thereafter hear and decide the issue as soon as possible, and shall submit his award in the case.

(d)    If no agreement on the selection of an arbitrator is reached within ten (10) days after a panel is tendered by the American Arbitration Association, the American Arbitration Association shall designate an arbitrator to rule on the matter.

(e)    Unless otherwise agreed to by the parties to the dispute, the arbitrator shall issue a written ruling after the dispute is submitted, and the arbitrator's decision and award in the case shall be final and binding upon the parties.

(f)    Except as modified by the foregoing time limitations, the arbitration shall be conducted pursuant to the American Arbitration Association's Voluntary Labor Arbitration Rules, as amended. All expenses of the arbitration, except expenses of legal counsel shall be borne equally by the contractor and the Union which are parties to the dispute.

27

(g)    When any matter is in dispute and has been referred to conciliation or arbitration for adjustment, the provisions and conditions prevailing prior to the time such matter arose shall not be changed or abrogated.

## ARTICLE XXIII
## COMPENSATION OF JOINT ARBITRATION MEMBERS

A.  Members would be compensated for each meeting attended. Recommended dollar amount $90.00 per meeting each.

B.  Joint Board would set up checking account through union's bank. Two signatures required, one management and one labor. Suggest union Business Manager or Secretary-Treasurer and management member with most time on Joint Board.

C.  Monies paid by employer found guilty of violating contract would go to appropriated funds. Union would receive dues or initiation fees owed. But all fines would go to Joint Board's checking account.

D.  Whenever Joint Board checking account had adequate funds to cover meeting costs plus reserve, Joint Board would make occasional donations to charities such as R.E. Shepherd Scholarship Fund.

E.  Joint Board would conduct a short financial meeting once per fiscal year, meeting to be held just prior to regular normal Joint Board meeting. So two meetings in one would actually take place once a year. Findings to be read by Local #67 Secretary-Treasurer.

F.  Joint Board would have the power to increase meeting expense each year if funds are available.

28

IN WITNESS WHEREOF, the parties hereto set their hands and seals as of the date first above written:

| The Contractors Association | Ceramic Tile Layers Local #67 BAC |
| George Lockadie | Frank O'Loan |
| Brad Trostrud | Robert Brown |
| Nancy Bourbon | Edward Juergensen |

DATE: _ALL SIGNATURES : APRIL 19, 2000_

DATED JUNE 1, 2000

29

RECEIVED
MAY 19 2005
PREMIER BARGAINING SERVICES

CVGP 2 * 3

THIS AGREEMENT MADE AND ENTERED INTO BY AND BETWEEN

FRK NO. :

FRK CO. INC.

ACME TILE CO INC
2229400 0067 IL

Name of Contractor: Acme Tile Co Inc

Firm: 37-1734938L

Address: Po Box 697 South Pekin IL

Phone: 309-348-1543

In consideration of the mutual promises made to each other, the parties herein called the "EMPLOYER," and Ceramic Tile Layers, Ceramic Tile Finishers, Terrazzo Workers, Terrazzo Finishers & Granite Cutters Union Local No. 67 of the International Union of Bricklayers and Allied Craftsmen, AFL-CIO, herein called the "UNION," agree as follows:

1. The EMPLOYER hereby recognizes the UNION as the sole and exclusive bargaining representative for and on behalf of employees of the EMPLOYER ...

2. The parties adopt and make a part hereof and the receipt of which is hereby acknowledged of a collective bargaining Agreement ... CHICAGO (CHICAGO TILE CONTRACTORS ASSOCIATION OF CHICAGO) ...

3. This Memorandum of Agreement shall remain in effect until the expiration ...

4. Either party desiring to amend or terminate this Memorandum of Agreement ...

5. The EMPLOYER agrees to be bound by and to comply with the terms and provisions of ... the Chicago Tile Institute Promotion Fund, ... Ceramic Tile Layers Apprenticeship Trust, Chicago Tile Institute Pension Trust, Annuity Trust, Bricklayers International Pension Fund and Pre-Apprentice Masonry Institute ...

6. The EMPLOYER agrees to furnish UNION with certificates covering liability insurance ... Illinois Workers' Compensation Act and the Illinois Occupational Diseases Act ...

IN WITNESS WHEREOF, the parties have executed this Agreement dated this ___ day of December, 200___.

EMPLOYER: Acme Tile Co., Inc.

(SIGN) BY: Edward Wymbs

(Print) BY: Edward Wymbs

CERAMIC TILE LAYERS, CERAMIC TILE FINISHERS, TERRAZZO WORKERS, TERRAZZO FINISHERS & GRANITE CUTTERS UNION LOCAL No. 67

(SIGN) BY: Edward Flaegebsen

(Print) BY: Edward Flaegebsen